Good morning, everyone. Welcome back to the Ninth Circuit. We have a different cast of characters up here, but we're ready to hear the final case of the day. Judge Hawkins, Judge Clifton and I welcome counsel. Just a quick reminder to counsel, if you want to save time for rebuttal, go ahead and keep track of your time. We have the lights to help guide you. When the light turns red, it starts flashing like I always say. It's not like the crosswalk where you get to keep walking. When the light turns flashing red, that means it's time to stop. And with that, we'll go ahead and proceed with our argument today. Counsel? May it please the Court, my name is Erin Campbell and I represent Relators Ralph Vassallo and Laura Spahn. I'll watch the clock, but I would like to reserve four minutes for rebuttal today. This is an appeal from a grant of summary judgment in a False Claims Act case for a private ambulance company who routinely certified its bills to Medicare to be true, accurate and complete. For purposes of appeal, though, the evidence demonstrates that 18% of those bills, or nearly one out of five, were falsely upcoded, costing taxpayers $2.49 million in government-paid overpayments. What's the proof of deliberate indifference or reckless disregard? That's your standard, isn't it? That's correct, Your Honor. Your negligence is not enough. I'm sorry, I didn't hear that. Mere negligence is not enough. Would you concede that? Yes, that is correct, Your Honor. Rural Metro received numerous warning signs and red flags from which the jury can conclude that it failed to make simple or limited inquiries into the truth or falsity of its certifications to the United States that they were true, accurate and complete. And these warnings are, first, warnings from the government, which Rural Metro acknowledged it knew it had to certify the truth, accuracy and completeness of its claims for Medicare. Rural Metro also admitted that it knew government payment depended upon compliance with the underlying laws, regulations and program instructions, including those requiring accurate coding of the medical necessity of the level of ambulance service provided and documented in the medical record. Those are warnings. Anybody who's dealt with Medicare or Medicaid and their Byzantine requirements for compliance and coding, doctors get it wrong, pharmacists get it wrong. What's the proof that these claims are different or acting with reckless disregard? Do you have a witness, for example, that says that someone went to an official at Rural Metro and said a very high percentage of these claims that you're submitting without review are absolutely inaccurate? Do you have that kind of proof? Yes, Your Honor. We have a lot of evidence of that, but to address your specific point, when Rural Metro switched to Lexicode, it stopped auditing its formal monthly Medicare audits for several months. And then when those audits resumed, it observed substantial amounts of up-coded claims for payment. Weren't your clients responsible for training Lexicode? Your Honor, Relator Loris... Can you start with a yes or no? Yes, Your Honor. Relator Loris Vaughn was responsible for doing some training of Lexicode's United States-based representative, Brian Pittman. However, the question of training is hotly disputed. We discussed that in our briefs. But it avoids the real question at trained the Lexicode coders, it was still required under this court's precedent to make simple or limited inquiries into the truth or the falsity of the claims before they were submitted to the United States. And that was not done. Additional evidence of warnings and red flags that Rural Metro ignored. Rural Metro knew that the Lexicode ambulance coders were brand new to ambulance coding, and it knew that they were not coding ambulance claims correctly. Those are additional red flags. And then Rural Metro was under a corporate integrity agreement due to its past noncompliance with Medicare regulations. That was another red flag. You were required to get the error code down to 5%, right? No, Your Honor. The corporate integrity agreement did contain an error rate provision, but that was a discrete provision that applied to just a reporting requirement for a discovery sample of claims. Outside of that limited requirement, the corporate integrity agreement separately required that Rural Metro quantify and notify the government of any overpayments without allowing any offsets for underpayments. At the district court, the United States filed a statement of interest explaining that and explaining that for those reasons, the corporate integrity agreement did not negate Rural Metro's scienter. Rural Metro in its 30B6 deposition itself admitted that it knew that if coders do a poor job coding, any undercoding of one batch of claims does not excuse the fact that another batch of claims was improperly overcoded. The difference between undercoding and overcoding could speak a great deal, to me at least, as to what the knowledge, intent, and understanding of the party was. What information is there as to what proportion of the miscoding is under and what proportion is over? Your Honor... And I saw at least one thing that suggested that over 70% of the miscodes were undercoding. Your Honor, the evidence of the record pertaining to the three Medicare audits that we cite to in our brief, the look-back audit, the wellness audit, and the first quarter of 2016 audit, all of those three audits show overcoding that was higher than undercoding. The wellness audit included no undercoded claims. The look-back audit had a positive, as Rural Metro would put it, financial error rate, which would indicate overcoding trumped were overcoded or not medically necessary, and only 3% were undercoded. Now, Rural Metro may cite to some reviews, but those reviews were of mixed payer sources and mixed types of claims, whereas these three audits were Medicare audits. And additional evidence of the warning signs that Rural Metro received and ignored were that then as part of its effort to increase its profits, Rural Metro outsourced the coding of its claims for payment to these brand new ambulance coders in the Philippines, while simultaneously removing all pre-submission quality assurance review of most claims to Medicare before the claims were submitted, simultaneously halting its monthly formal Medicare audits and reducing the training of its coders, thereby burying its head in the sand in a classic False Claims Act sense. Well, the burying its head in the sand is premised upon their understanding that there was more overcoding than undercoding, because if you have errors that made it awash or if the company is actually losing money in the end, I really am struggling with the same question Judge Hawkins raised. What tells us that the company knew things that should have alerted it that it wasn't losing money from its own pocket more as a problem than overcharging the government? I want to make sure I understand your question correctly. So you want to know what evidence is there at the time that Rural Metro outsourced the coding to the Lexicode coders at that time that there wasn't more undercoding versus overcoding. Why should it have thought that this was going to produce the results you allege that it resulted? If they didn't anticipate that, if this change was made, I mean, to start with, they're under this CIA, which is a great acronym, but I don't remember what it stands for, but they're what had gone on before. So it's not like they had a world-beating system that was entirely accurate, and they have their own reasons for wanting to expedite the claim process, because they get paid sooner when they get the claim in sooner. What should have told them the danger here was that you were going to produce overcharging of the government if they had an understanding, as they've argued, that the coders were told err on the side of caution. So what is it that leads us to conclude that deliberate indifference is the explanation, not just a foul-up or negligence? Certainly, Your Honor. Before the transition to the Lexicode coders, Rural Metro knew that there were inaccuracy problems with the Lexicode coders. Their senior vice president admitted that he had been warned by relators and the vice president that there were inaccuracy problems. Relator Spahn had reviewed 50 claims to Medicare and saw that all 50 were inaccurately coded. And Rural Metro's obligation under this court's Bourseau opinion, under the D.C. Circuit Kryzak opinion, is to make simple inquiries into the truth or falsity of the claims, to make sure that they are accurate before they are submitted. And so when it outsourced the coding, it removed its process for doing that prior to the outsourcing, which was to have the experienced billing managers and supervisors review most of the claims to Medicare to make sure that the claims were, by and large, accurate. And so even if, under the court's McBee case, if there's some compliance efforts, that does not excuse the continued submission of false claims. Do you want to reserve time? Yes, Your Honor. Thank you. Good morning, Your Honor. Is the court's offer to reserve time? First state your name for the record. Absolutely. My name is Noam Fishman. I'm here with Jennifer Axel for Rural Metro Corporation and Rural Metro Operating Company. And I'm just inquiring if the offer to reserve time applies to us as well, because if so, I'd love to reserve a minute. Well, no. There's no, we don't do serve up. Okay. That's what I figured, Your Honor. Your Honor, Relators Lara Spahn and Ralph Asallo have asked this court to overturn the ruling of Judge Bolton's summary judgment, because they believe that Judge Bolton applied the wrong scienter standard for a False Claims Act violation and got the wrong result. Okay. Let's start. Yes, Your Honor. First of all, you had, your client had this advanced claim billing system, which automatically submitted claims to Medicare without being vetted, correct? Your Honor, no. That's not correct. The auto-submit function... Tell me why it's not correct. Because the auto-submit function wasn't functional at the time of the transition. It was functional... I'm not sure. This is before Lexicode. No, no, no. No, Your Honor. The auto-submit was not functional before Lexicode. It became functional after Lexicode. Okay. And your client knew there were at least some problems with Lexicode, didn't they? Well, at the time, Your Honor, we have to take this... This regard. First of all... They were aware. Officials of your client's company were aware there were problems with coding. At the various points in time, Your Honor, we have to take a look at when we are temporally. So in June 2014, when the beta testing time period first started, there was a report that there were problems with Lexicode for a specific coding level, specifically the SCT coding level, which is not an issue before this Court. Before this Court is only one specific ALSE coding level. That's the emergency... Whatever the coding level was, after receipt of knowledge of that, they continued to submit claims to Medicare without review. Your Honor, they... Is that correct or incorrect? That's incorrect. Tell me how. Tell me how. Well, they did review the claims both... Well, initially, they submitted all claims that were not SCT claims. So you're correct, Your Honor, with respect to non-SCT claims. With respect to SCT claims, those claims were held back, Your Honor. So your position is it's okay if someone alerts you that there's a claim over here that you don't have to... That's not an alert to look for other possible coding errors. Well, they did look for other coding errors and they did keep them... Prior? Not before submitting, Your Honor. But they did go back and take a look. There was the look-back audit, which covered the time period at issue and found a error rate that was below 5%. Any over-coded claims were refunded, Your Honor. There's evidence in the record that we refunded over $880,000 in claims for the time period at issue. So the idea that we just let these claims go and never went back to look for them and figure out if any of them were problematic, I would disagree with, Your Honor. In fact, we did go back, we did look, and we did refund over-coded claims. Is the standard to prove reckless disregard subjective or objective? Your Honor, I believe there's... Can you start? If it's not one or the other, tell me. Isn't it one or the other? I think it's an element of both, Your Honor. I think reckless disregard requires recklessness on an objective level, something that is beyond what a reasonably prudent person would do, because, of course, that would be a negligence standard. So, objectively, it's reckless. And then I think subjective intent does matter when you take a look at what the conduct was here. So here, specifically, Your Honor, we had a situation where we transitioned to a lexicode outsourced billing system. And we can talk about what lexicode was at the time and whether or not that transition was reasonable. And then beyond that, lexicode were experienced coders, one of the nation's largest outsourced coding solutions. They hired only ambulance-certified coding supervisors, which is something that rural metro itself did not have, Your Honor, at the time, right? So they required that their supervisors be certified in ambulance coding. Then they trained them with the same training program required by the Office of Inspector General, the OIG, as part of our corporate integrity agreement. We trained lexicode with the same training materials that we trained our own folks. They were more qualified to do this job than our own folks. And the individual coders that they hired had advanced degrees in some sort of health sciences. Oftentimes, they were nursing graduates. Rural metro for itself, most of its coders barely had a high school education. So we hired a qualified coding company that itself was mandated under the contract to hire qualified supervisors and qualified coders. And then we remained involved. Oftentimes, in the healthcare industry, Your Honor, when you hire outsourced solutions, you step back and you let them do their job, and maybe you audit a year later or something like that. Isn't reasonableness a fact question? I think that reasonableness can be a fact question, but if there's no facts at play, there's no facts in the case from which a reasonable juror could find. They say, you, your client, was aware of coding errors, notwithstanding that, submitted unreviewed claims to Medicare. And you say, that's not true. We acted reasonably under the circumstances. Isn't that a fact question? In this case, Your Honor, I don't think it is, and here's why. You think it's a question of law? Well, I think it's application of facts that are undisputed to law. It's the inferences that can be fairly drawn from the facts. And in this case, considering that all of their evidence, every scintilla of evidence that exists in this case, after the transition, August 1, 2014, emanates from our efforts to police ourselves. It's our audits. It's our internal compliance reviews. It's our compliance with the Corporate Integrity Agreement. It's the Independent Review Organization, which we hired pursuant to the Corporate Integrity Agreement, that created a third-party record of our compliance efforts. And this IRO, the Independent Review Organization, found in three consecutive years that we had 0% errors, 0% errors, and I think one year there were fewer than 2% errors, clearly within the confines of what was required under the Corporate Integrity Agreement. Against that backdrop, against a backdrop that shows clear efforts to comply, and in addition, a financial error rate, which Your Honor alluded to with opposing counsel's argument, that was, for months and months and months, under zero. It was a negative financial error rate, suggesting that we were undercoding more, far more, than we were overcoding. In fact, the frustrations that, again, our own Chief Compliance Officer expressed that are in the record are frustrations that they couldn't code the claims correctly. They were undercoding far too many claims. For a company like Rural Metro, whose margins are razor-thin, that's a problem because we are just going out of business. In this case, Your Honor has before the Court SCR 529. It is a compendium of all of the audits that took place in 2015, up through I believe it's either October or November 2015, for all the different jurisdictions. You'll see from February onward, it's a negative financial error rate every month in every jurisdiction. A negative financial rate, or sometimes it's called net impact, which functionally in the document is the same thing as the financial error rate. The other piece of evidence that they point to, to suggest that we did something wrong, we put our head in the sand, is the notion that we suspended our auditing system, our compliance system, between August 2014 and the end of 2014. The record actually reflects that although we technically suspended our system, we actually engaged in a far more robust review of Lexicode-coded claims than our system called for. Let me give Your Honor an example. Under their corporate compliance program, we were required to pull a randomized sample of 50 claims, Medicare claims, and 50 Medicaid claims every month. In total, we were reviewing about 100 claims a month for compliance. Under these facts, after the transition to Lexicode, the undisputed evidence is in October 2014, and we just pulled a couple of months to give the court an example. Devani Perna, who is one of our chief auditors, reviewed over 500 claims in that month alone to confirm compliance. In December 2014, two months later, Ms. Perna pulled over 800 claims, many, many multiples of what actually was required under their compliance program. They suspended the compliance program because it wasn't enough. They wanted to do more to make sure that the transition to Lexicode was as smooth as possible. Was it perfect? Absolutely not, Your Honor. It was not perfect. But perfection is not the standard under the False Claims Act. Certainly not perfection. What was your client's response in July of 2014 to the backlog of claims, backlog meaning they hadn't been submitted, in Colorado? So, in Colorado, it's an interesting market, Your Honor, because we're not a Medicare market in Colorado. I promise you, I'm not interested in whether it's a wonderful market or interesting or not. Is it correct that in July of 2014, there was a backlog of claims in Colorado? There was, Your Honor. And that the company's response to that was to submit to Medicare unreviewed claims? No, those claims were reviewed, Your Honor, but they weren't re-reviewed. So there wasn't a supervisor-level review of those claims. They were reviewed and they were coded. And the only indication that we had that there was any problem with those claims were reports about these SCT claims that I talked about earlier in my argument, Your Honor. There were problems with the SCT claims, and they were withheld. They were not billed. The realtors claim that as a result of the Colorado situation, you sent in 4,000 claims and at least 300 of them were for services at issue in this case. Is that right? Your Honor, of the claims that were submitted generally around that time period, not Colorado, we submitted 308 claims for ALS 1e Medicare submissions around the date that they say claims were submitted. Now, they alleged in their complaint that there were thousands upon thousands of claims that were submitted. We went back and took a look at all of our submissions for the week that they claimed that this happened. At no time during that week were thousands and thousands of claims submitted. On one particular two-day period around the time they alleged, we submitted about 400 and, let's say roughly 450 claims, of which 306 or 308 of those claims were Medicare ALS 1e claims. Again, not Colorado, Your Honor. That's not a Medicare state. It was for other parts of the country, Arizona, I think. And those claims were subject to review, and they were also subject to the look-back audit. I posed a question to Plaintiff's Counsel with regard to the comparison between undercoding and overcoding. And I'll put the same question to you. Where would I look in the record to find what evidence there is on the subject as to what it is the company should have understood? You cited SER 529, but I couldn't tell if that was meant to be a reference to the same subject or not. Yes, Your Honor. So SER 529 is something that we've called colloquially in the papers the lexicotracker. And there are a lot of individual lexicotrackers. It reflects the daily review that Devani Parna was doing of Lexicode's work to try to find real-time if there were any issues. When Rural Metro in December of 2014 hired an outside consulting company, Deloitte, to help solve the revenue cycle problems, Lexicode, and not just Lexicode, it was broader than Lexicode. The Deloitte sounded like it had more to do with expediting the processing so the claim could get in. I didn't really see that as much with regard to the error rate. That was part of it, Your Honor. But there was definitely a communication breakdown with Lexicode, which Rural Metro recognized. And part of Deloitte's scope of services, part of their responsibility was to identify where the communications breakdowns were and to help Rural Metro quantify whether or not it actually has an issue. And so it formalized the process that Devani Parna had been engaging in since August 2014. It changed the training program slightly. Still the training program was tied to the corporate integrity agreement that Your Honor referenced in my opposing counsel's argument. And in addition, it actually created a very large spreadsheet of all the lexicotrackers and it amalgamated all of the trackers into this massive SER 529 that provides a month-over-month record of compliance efforts. And so we start with a look-back audit in January of 2015, which covered the time period from roughly July 14 onward, clearly through the transition period. And then the Lexicotracker then goes month after month after month thereafter. And what you see is continuous improvement. You see that in the early months, there was a financial error rate that was positive, still under 5%, the threshold set by the corporate integrity agreement. However, as the months progressed, the training programs worked. If anything, Rural Metro was leaving a very significant amount of money on the table with the government. As I say, I had missed the 529. Does that speak to the over- and under-coding distinction? It does. There is a column there, Your Honor, that is either called financial error rate or net impact. And those columns will, you'll see, you have to expand them. It's a very large spreadsheet. But you'll see the principle that I'm talking about. Thank you very much, Counsel. Thank you. Thank you. Your Honors, Mr. Fishman has just discussed disputed fact after disputed fact about Rural Metro's claimed efforts to fix the problems. But it's undisputed that despite those efforts, Rural Metro's efforts were not entirely successful. Rural Metro continued to submit the op-coded claims for payment despite its knowledge of lexicode coding problems. And it never at any point disclosed to the United States that it was having problems with those lexicode coders. To address a few of his points, the corporate integrity agreement training that Mr. Fishman referred to, Rural Metro's witnesses conceded that that program did not adequately train coders how to code and that it focused on issues like anti-kickback statute training. The $880,000 worth of claims that Rural Metro paid back was just a fraction of the total overcharges to the United States compared to the $2.49 million in damages which our experts calculated that are just due to the over-coded portion of the claim itself. And while the evidence presented by Mr. Fishman at summary judgment on where this $880,000 in recoupments and refunds comes from is vague, what we do know is that it does not represent a concerted attempt or effort to make the United States whole. Can you help us by pointing to a specific instance in which officials at Rural Metro were alerted to a particular type of coding error and notwithstanding being alerted to those coding errors, nonetheless submitted to the United States government claims that were unreviewed as to that specific error? As to the ALS level one emergency claims? Yes, I'm asking you pick. You pick. Point to one that where somebody went to someone in a position of authority at Rural Metro and said, we have a real problem with the following fill-in-the-blank type of coding error. Something must be done about it. And notwithstanding that, the officials decided to submit claims that were unreviewed for that purpose to the U.S. government. Your Honor, I cannot point to a specific instance where Rural Metro had actual knowledge that the claim was false. Alerted to. Alerted. Aware of. Pick your trajectory phrase. What I can't point to is where someone said, this claim is false, and Rural Metro's executive said let's submit it anyway. But we're not required to point to that quantum of evidence. The closest we have to the situation you're referring to is the incident in July of 2014 where our clients and the compliance vice president warned Rural Metro's executives that the unreviewed lexicode claims, and certainly Rural Metro's vice president said it was 4,000 in his letter to our clients. But whatever number it was, it is not disputed that despite the warnings of these employees that Rural Metro still chose to submit those unreviewed claims anyway, and then immediately outsourced all the coding to Lexicode and slashed its quality assurance procedures. I can ignore the clock. Is it part of your theory that if officials at Rural Metro were alerted to let's call it problem X, that that being alerted to X required them to review claims for Y and Z? Yes, Your Honor, and that is because the False Claims Act puts an affirmative obligation on government contractors to turn square corners and to make simple inquiries to make sure that their certification that a claim is true, accurate, and complete is in fact true, accurate, and complete. You have me at yes. Yes. Thank you. Thank you, Your Honors. If there are no further questions, my... No. Thank you so much, counsel. Thank you both for your arguments. Thank you. Thank you. This matter is submitted. Thank you. All rise. The case is submitted.
judges: Hawkins, Clifton, Owens